Henry TASSIN, et al.,

v.

SEARS, ROEBUCK AND CO., et al.

Civil Action No. 93–147.

United States District Court,
M.D. Louisiana.

Dec. 5, 1996.

Anthony M. Fazzio, Lafayette, LA, Daniel J. McGlynn, McGlynn, Blanchfield & Glisson, Baton Rouge, LA, for Henry Tassin, plaintiff.

Edward F. Kohnke, IV, Francis H. Brown, III, Charles William Belsom, Jr., Frilot, Partridge, Kohnke & Clements, L.C., New Orleans, LA, for Sears, Roebuck and Co., Emerson Electric Co., defendants.

Edward F. Kohnke, IV, Frilot, Partridge, Kohnke & Clements, L.C., New Orleans, LA, for The Singer Company, defendant.

### ORDER AND REASONS

VANCE, District Judge.

Before the Court is Defendants' Motion to Exclude the Expert Testimony of Stephen Killingsworth. The Court conducted a *Dau-* *bert* hearing on Friday, November 22, 1996. For the reasons stated below, defendants' motion is granted in part and denied in part.

## I. BACKGROUND

This is a product liability case arising out of an injury to the left hand of plaintiff, Henry Tassin. Mr. Tassin sustained the injury in 1992 while using a Craftsman 10–inch table saw manufactured by defendants, Sears, Roebuck, and Company ("Sears") and Emerson Electric Company ("Emerson"). Mr. Tassin purchased the saw from Sears in 1989.

Plaintiff seeks recovery under the Louisiana Products Liability Act ("LPLA" or "the Act"), La.R.S. 9:2800.51–9:2800.57, on the theories of defective design and inadequate warning. Mr. Tassin intends to introduce the expert testimony of Stephen Killingsworth on both of these issues, as well as on a claim that there was concerted action by power tool manufacturers to avoid incorporating safety devices into their products.

Defendants now move to exclude Mr. Killingsworth's testimony on the grounds that his opinions regarding alternative product design are speculative and that his methodology fails to satisfy the scientific rigor required by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Additionally, defendants challenge Mr. Killingsworth's criticism of their product warnings as not properly grounded in the scientific method. Finally, defendants seek to exclude Mr. Killingsworth's testimony concerning an alleged conspiracy in the power tool industry as irrelevant, not the proper subject of expert testimony, and as more prejudicial than probative.

## II. LEGAL STANDARDS

### A. The Louisiana Products Liability Act

Section 2800.54(A) of the LPLA provides that a product manufacturer shall be liable to a claimant for damage proximately caused by an unreasonably dangerous characteristic of the product, if such damage arises from a reasonably anticipated use of the product by the claimant. Under the LPLA, a product

can be unreasonably dangerous: (1) in construction or composition; (2) in design; (3) because an adequate warning about the product has not been provided; or (4) because the product does not conform to an express warranty of the manufacturer. La.R.S. 9:2800.54(B).

Plaintiffs here have asserted that defendants' table saw was unreasonably dangerous in design and/or due to an inadequate warning. The LPLA establishes the elements of each of these claims.

### 1. Defective Design

To establish that a product is unreasonably dangerous in design, a claimant must prove the following: (1) that there existed an alternative design for the product that was capable of preventing the claimant's damage at the time the product left the control of its manufacturer; and (2) that the likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product. La.R.S. 9:2800.56. An adequate warning about a product must be considered in evaluating the likelihood of damage when the manufacturer has used reasonable care to provide an adequate warning to users and handlers of the product. *Id.*

### 2. Inadequate Warning

To establish that a product is unreasonably dangerous because of an inadequate warning, a claimant must show that at the time the product left the manufacturer's control, the product possessed a characteristic that could cause damage and that the manufacturer failed to use reasonable care to provide an adequate warning of the danger to users and handlers of the product. La.R.S. 9:2800.57(A). The manufacturer is not required to provide an adequate warning about his product when: (1) the product is not dangerous to an extent beyond that which would be contemplated by the ordinary user or handler of the product, with the ordinary knowledge common to the community; or (2) the user or handler of the product already

knows or reasonably should be expected to know of the potential danger of the product. La.R.S. 9:2800.57(B).

### B. The *Daubert* Decision

■ In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court addressed the standard for admitting expert scientific testimony under the Federal Rules of Evidence. It concluded that the Federal Rules of Evidence replaced *Frye v. United States*, 293 F. 1013, 1014 (1923), which required scientific evidence to be "generally accepted" as reliable in the relevant scientific community before it could be admitted. Under Rule 702 of the Federal Rules of Evidence, a "trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Id. 509 U.S. at 589, 113 S.Ct. at 2795. The Court added that "this entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology can properly be applied to the facts in issue." *Id.* at 592–93, 113 S.Ct. at 2796. The Court held that the proposed testimony must be supported by "appropriate validation—*i.e.,* 'good grounds,' based on what is known." *Id.* The Court then made some "general observations" as to the factors that may inform the district court's preliminary assessment, stressing that many factors bear on the inquiry and that it was not setting forth a "definitive checklist." 509 U.S. at 593, 113 S.Ct. at 2796–97. The Court mentioned the following factors: (1) whether the expert's hypothesis can be and has been tested; (2) whether the hypothesis has been subjected to peer review or publication; (3) the known or potential rate of error; and (4) whether the theory is generally accepted within the relevant community. *Id.* at 593–94, 113 S.Ct. at 2796–97. The *Daubert* Court stressed that the inquiry is a flexible one focused solely on principles and methodology, not on the conclusion generated. *Id.* at 594–95, 113 S.Ct. at 2797.

■ Defendants contend that the Court must systematically apply the *Daubert* factors to Mr. Killingsworth's opinion on alter-

native designs and inadequate warnings. The Court in *Daubert* specifically stated that its discussion was limited "to the scientific context," noting that Rule 702 also applies to "technical or other specialized knowledge." *Daubert,* 509 U.S. at 590 n. 8, 113 S.Ct. at 2795 n. 8 (citing Fed.R.Evid. 702). The applicability of *Daubert's* analysis outside the context of novel, scientific evidence is the subject of debate. *Compare Thomas v. Newton International Enterprises,* 42 F.3d 1266, 1270 n. 3 (9th Cir.1994) (*Daubert* confined to evaluation of scientific testimony); *Compton v. Subaru of America,* 82 F.3d 1513, 1517–19 (10th Cir.1996) (*Daubert* factors only apply to unique, untested or controversial methodologies), *with Cummins v. Lyle Industries,* 93 F.3d 362, 367–68 & n. 2 (7th Cir.1996) (applying *Daubert* analysis to technical issues of product design). Nevertheless, the courts are in agreement that, at a minimum, *Daubert* and Rule 702 of the Federal Rules of Evidence require the district court to determine preliminarily that expert testimony is relevant and that it rests on a reliable foundation before it can be admitted into evidence. *See Daubert,* 509 U.S. at 597, 113 S.Ct. at 2799 ("The Federal Rules of Evidence . . . assigned to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand"); *United States v. 14.38 Acres of Land,* 80 F.3d 1074, 1078 (5th Cir. 1996); *Marcel v. Placid Oil Co.,* 11 F.3d 563, 566 (5th Cir.1994); *Pestel v. Vermeer Manufacturing Co.,* 64 F.3d 382 (8th Cir.1995) (trial court must screen expert evidence for relevance and reliability); *Compton v. Subaru of America,* 82 F.3d 1513, 1519 (10th Cir.1996). Moreover, it has long been the rule in the Fifth Circuit that an expert must come to court with more than his credentials and a subjective opinion in order to be permitted to testify. *Viterbo v. Dow Chemical Co.,* 826 F.2d 420, 422 (5th Cir.1987). *See also Berry v. Armstrong Rubber Co.,* 989 F.2d 822, 827–28 (5th Cir.1993) (affirming exclusion of expert opinion under Rule 703).

Nevertheless, the Fifth Circuit has recently cautioned us that while *Daubert* articulated standards for determining the reliability of scientific expert testimony, *Daubert* "did not otherwise work a seachange over federal evidence law." *United States v. 14.38 Acres of Land,* 80 F.3d at 1078. The Fifth Circuit stressed that the district court's gatekeeping role does not supplant the adversary system, which traditionally and appropriately provides sufficient means to attack "shaky but admissible evidence." *Id.* (citing *Daubert,* 509 U.S. at 595–97, 113 S.Ct. at 2798). In *14.38 Acres of Land,* the Fifth Circuit reversed a trial court's ruling that had, among other things, excluded the opinion of a civil engineer in an expropriation case on the probability that plaintiff's property would experience flooding. The engineer's opinion was based on his review of maps, photographs and data, his physical inspection of the property and his experience as a civil engineer. In a similar vein, the Second Circuit has recently admonished trial courts not to push *Daubert* too far. In *McCullock v. H.B. Fuller Co.,* 61 F.3d 1038 (2d Cir.1995), the Second Circuit said that *Daubert* had not anointed trial courts with the powers of St. Peter at the Pearly Gates:

> Trial judges must exercise sound discretion as gatekeepers of expert testimony under *Daubert.* *Fuller,* however, would elevate them to the role of St. Peter at the gates of heaven, performing a searching inquiry into the depth of an expert witness's soul—separating the saved from the damned. Such an inquiry would inexorably lead to evaluating witness credibility and weight of the evidence, the ageless role of the jury.

61 F.3d at 1045 (affirming admission of a consulting engineer's testimony that plaintiff was in "breathing zone" of glue flames when his opinion was based on examination of safety literature, extensive practical experience, examination of warnings provided by the defendants, background industrial experience with ventilation systems and interviews with the plaintiff).

### 1. Alternative Designs

In the context of this case, the first issue is what indicia of reliability are required to admit engineering testimony on alternative designs in a consumer products liability action. The Fifth Circuit has not directly answered this question after *Daubert.* The

case law from other courts varies on the degree of rigor required. On the one hand, the Seventh Circuit has systemically applied *Daubert*'s analysis to cases involving engineering principles. *See, e.g., Rosen v. Ciba–Geigy Corp.,* 78 F.3d 316 (7th Cir.1996); *Cummins v. Lyle Industries,* 93 F.3d 362 (7th Cir.1996). The Seventh Circuit demands that the expert's trial testimony demonstrate the same degree of intellectual rigor that applies in the field of the expert's professional work. *E.g., U. Khan v. State Oil Co.,* 93 F.3d 1358, 1364 (7th Cir.1996) (an economist, like natural scientists, is not permitted to offer evidence he has not generated by the methods he would use in his normal or professional work, that is, work undertaken without reference to use in litigation); *Cummins v. Lyle Industries,* 93 F.3d at 369 (same as to engineers).

In *Cummins v. Lyle Industries,* for example, the Seventh Circuit affirmed the exclusion of expert testimony on the alternative design of a trim press. The Court found the *Daubert* analytical framework applicable and affirmed exclusion of the alternative design testimony because the alternative design had not been tested, and the expert's opinions lent themselves to testing and substantiation by the scientific method. The plaintiff argued that testing was not applicable because his designs involved simple "off-the-shelf" components and widely-accepted engineering principles. The Court rejected this argument because the expert went further and stated that the design should have been incorporated into the trim press, which involved considerations that could not be reliably determined without testing. Moreover, the expert admitted that testing was a necessary part of the design process. The expert had not read any studies, surveys, or analyses of how the machine in issue was designed, manufactured or used; nor had he published any writing concerning the incorporation of his design, so that his theories had not been subjected to peer.review.

Similarly, in *Pestel v. Vermeer Manufacturing Co.,* 64 F.3d 382 (8th Cir.1995), the Eighth Circuit affirmed the use of a *Daubert* analysis to exclude expert testimony about the design of a guard for a stump cutter.

The district court found the expert's testimony wanting under *Daubert* because he had not tested his guard, he had not contacted others in the industry to see if they had attempted to create a similar type of guard, he had not subjected his concept to any manufacturers, academicians or engineering professors for scrutiny, he had not performed a patent search to determine whether other guards existed or were feasible, and he had not talked to any operators who worked with this type of machinery. *See also Peitzmeier v. Hennessy Industries, Inc.,* 97 F.3d 293, 297 (8th Cir.1996) (excluding expert opinion where expert neither designed nor tested for safety or utility any of the proposed safety devices for the tire changing machine, nor did he conduct any peer consultation); *Carmichael v. Samyang Tires, Inc.,* 923 F.Supp. 1514 (S.D.Ala.1996) (expert could not point to any tests or other procedures to corroborate his visual inspection of the tire and conceded that no papers or publications approved or otherwise discussed his technique of tire failure analysis).

Other decisions have sought to distinguish instances in which an expert's testimony is based primarily on his experience or training from cases in which his testimony is based on the application of a methodology or technique. *See, e.g., Compton v. Subaru of America,* 82 F.3d 1513, 1518 (10th Cir.1996); *Liriano v. Hobart Corp.,* 1996 WL 660904 (S.D.N.Y.1996). *Cf. Lappe v. American Honda Motor Co.,* 857 F.Supp. 222 (N.D.N.Y. 1994) (*Daubert* analysis inapplicable where expert bases opinions on facts, an investigation, and traditional technical/mechanical expertise); *Officer v. Teledyne Republic/Sprague,* 870 F.Supp. 408, 410 (D.Mass. 1994) (*Daubert* principles have less use in fields like design engineering where "general acceptance" is the norm not the exception). In *Compton v. Subaru of America,* 82 F.3d 1513 (10th Cir.1996), for example, the Tenth Circuit ruled that the district court properly allowed an aerospace and mechanical engineer with experience in automotive engineering to testify as an expert in a products liability action concerning whether the roof design and support system of an automobile were defective. The engineer had never conducted or observed rollover tests or static

tests of roof crush while he worked as an automotive engineer, but he opined that the vehicle was defective because it permitted excessive roof crush. He also testified as to an alternative design and proposed standards that the vehicle should have met as to head room and ability to withstand force.

The Tenth Circuit reasoned that *Daubert* makes clear that the factors outlined by the Court "are applicable only when a proffered expert relies on some principle or methodology." *Id.* at 1518. The Court found that "application of the *Daubert* factors is unwarranted in cases where expert testimony is based solely upon experience or training." *Id.* Outside of the context of "unique, untested, or controversial methodologies or techniques," Rule 702 merely requires the trial court to make a preliminary finding that the proffered expert testimony is both relevant and reliable. *Id.* Hence the Court found the *Daubert* factors inapplicable to the case before it because the engineering testimony in issue was not based on any particular methodology or technique but "upon general engineering principles and . . . years of experience as an automotive engineer." *Id.* The expert had considerable experience in vehicle components engineering, and he had been involved in the development of the roof design of a particular Ford pickup truck. After becoming a "consulting engineer," the expert performed numerous design analyses on the roof and support structures of various vehicles. In arriving at his conclusion that the accident vehicle was defectively designed, the expert relied upon his inspection of the accident vehicle and an undamaged station wagon of the same make and model year. He did not base his opinions on actual testing but on comparisons with accident studies, proposed but not adopted standards, technical papers about experimental safety vehicles and technical discussions of the advantages of certain types of roof structures. The Court rejected defendants assertion that the testimony should have been excluded because there was no peer review, testing or evidence of general acceptance of the expert's theory.

Similarly, in *Liriano v. Hobart Corporation*, 1996 WL 660904 (S.D.N.Y.1996), the court permitted a safety consultant with 40 years of experience analyzing machine guarding, safety warnings and related safety issues to testify that a meat grinder was defectively manufactured and carried inadequate warnings. Plaintiffs sued the manufacturer for failing to warn users of the dangers of operating its machine without a guard. The expert based his opinion on his background and experience, and he denied that additional testing was required beyond his personal inspection of the machine and premises in order to support his opinion that the meat grinder was defectively manufactured. The district court held that the *Daubert* test should not be invoked to determine the admissibility of the expert's testimony: "It is not appropriate to invoke the *Daubert* test in cases where expert testimony is based solely on experience or training, as opposed to a methodology or technique." 1996 WL 660904 at *4.

This Court finds that a distinction between expert opinions involving methods and techniques and expert opinions involving experience or training is not particularly useful in the context of alternative design testimony. An alternative design is by definition a different method of configuring the product. In the *Compton* case, for example, the expert was clearly proposing that the vehicles be constructed by some other method that would embody his proposed standards.

Further, this Court does not believe that the *Daubert* factors are irrelevant to a case involving alternative product designs. If an engineering expert can demonstrate that his proposed design has been tested, peer reviewed, or is generally accepted, then so much the better. On the other hand, this does not mean that engineering testimony on alternative designs should be excluded automatically if it cannot withstand a strict analysis under *Daubert*. The inquiry is case specific. It may well be that an engineer is able to demonstrate the reliability of an alternative design without conducting scientific tests, for example, if he can point to another type of investigation or analysis that substantiates his conclusions. For example, an expert might rely upon a review of experimental, statistical or other technical industry data, or on relevant safety studies, products

surveys, or applicable industry standards. He could also combine any one or more of these methods with his own evaluation and inspection of the product based on experience and training in working with the type of product in issue. The expert's opinion must, however, rest on more than speculation, he must use the types of information, analyses and methods relied on by experts in his field, and the information that he gathers and the methodology he uses must reasonably support his conclusions. If the expert's opinions are based on facts, a reasonable investigation, and traditional technical/mechanical expertise, and he provides a reasonable link between the information and procedures he uses and the conclusions he reaches, then rigid compliance with *Daubert* is not necessary.

### C. *Mr. Killingsworth's Opinion and Testimony*

Mr. Killingsworth issued two written opinions, two affidavits, and was deposed three times in this case. He also testified under direct and cross-examination at the *Daubert* hearing on November 22, 1996. Mr. Killingsworth has opined that the accident in issue was caused by the phenomenon of kickback. A review of Mr. Killingsworth's reports, depositions, and affidavits indicates that he has mentioned the following items as alternative designs for the table saw in issue: 1) miter gauge hold-down clamp; 2) the Shophelper; 3) the integrated Shophelper; and 4) pawls, rollers, roller clamps, clamps and fingers. In addition, Mr. Killingsworth proposes to interpret some 5,000 pages of minutes, correspondence and memoranda of the Power Tool Institute and to offer an opinion that the defendants acted in concert with other power tool manufacturers to prevent safety devices from becoming incorporated into their products out of a concern with lawsuits. Finally, Mr. Killingsworth opines that defendants' product warnings as to the dangers of kickback were inadequate. Defendants seek to exclude Mr. Killingsworth's testimony on all of the foregoing matters.

### 1. *Mr. Killingsworth's Training and Experience*

Mr. Killingsworth is a professional engineer with an undergraduate and a master's degree in mechanical engineering. He is employed by the Louisiana Productivity Center at the University of Southwestern Louisiana. The Productivity Center assists Louisiana businesses in various areas, such as product development, quality control, manufacturing, contracting, and administration. He has worked with the Productivity Center for nine years. His work there did not involve the design of power tools like table saws. Besides his work with the Productivity Center, Mr. Killingsworth had 13 years of experience working at various companies in design engineering. He worked on the design of marine deck equipment, materials handling equipment, and pedestal cranes for the offshore and marine industry. He also briefly worked on the design of an amphibious excavator and a personnel carrier for use in the construction and geophysical industries. Mr. Killingsworth has also worked as a consultant in the design of industrial and oilfield machinery and structures. In addition to his affiliation with the Productivity Center, Mr. Killingsworth is the President of Design Analysts: Engineers and Consultants, which is engaged in litigation-oriented consulting work. In that capacity, he has evaluated the designs of numerous products.

As to his familiarity with table saws, Mr. Killingsworth indicated in his first deposition taken in May of 1994 that he used his father's table saw in high school. May 1994 Depo. at 9–10. He also used a table saw 15 years ago in building his home, for various design projects when he was in graduate school, and on at least one occasion in his work at the Louisiana Productivity Center. He has never owned a table saw. *Id.* at 96. His design experience with power saws is limited to consulting work in three or four prior lawsuits. Mr. Killingsworth could not recall analyzing the design of a table saw prior to his involvement in this case. *Id.* at 91.

### 2. *Alternative Designs*

### a. *Miter Gauge Hold–Down Clamp*

Mr. Killingsworth's testimony as to proposed alternative designs has been somewhat

of a moving target. In his expert report of March 18, 1994, Mr. Killingsworth stated that alternative designs were available that would have prevented the kickback that caused Mr. Tassin's injury. The only alternative design that he identified in that report was a hold-down clamp for the miter gauge on the saw. Mr. Killingsworth opined that the miter gauge on the saw was not standardly equipped with a hold-down clamp. Rather, Sears sold the hold-down clamp as an optional accessory. He believed that the hold-down clamp would have helped stabilize the workpiece. He stated that defendants should have packaged the miter gauge accessory with the hold-down clamp as standard equipment.

Mr. Killingsworth's investigation at that time consisted of a review of the following materials: plaintiffs' depositions, the respective responses of plaintiffs and defendants to interrogatories and document requests, the manual for the table saw, plaintiffs' accident reconstruction videotape, and the report and deposition testimony of defendants' expert, Jack Hyde. Mr. Killingsworth also relied on his review of certain reports of the Consumer Products Safety Commission's National Commission on Product Safety; the 1979 and 1980 iterations of a University of Missouri report called the Carson Study, and a text entitled Product Safety Engineering for Managers: A Practical Handbook and Guide. He stated that he had tested circular saws in other litigation. Prior to issuing his first report, Mr. Killingsworth had examined the table saw in issue briefly in plaintiff's counsel's office. He had not tested any alternative designs for the table saw, did not know who else manufactured table saws, reviewed no test results of others on any alternative designs, and admitted that the studies he reviewed did not identify any particular alternative design for the table saw in issue. Indeed, at the time Mr. Killingsworth issued his opinion, he had never actually seen or tested the hold-down clamp in issue, had never reviewed anyone else's test of it, nor had he surveyed other manufacturers concerning the design or use of such a clamp. In addition he did not review such surveys prepared by anyone else. He conceded that he had not looked into all of the problems the

use of such a clamp might cause. *Id.* at 65–67. In addition, he was aware of no one else who shared his opinion. *Id.* at 48.

Mr. Killingsworth was deposed again 18 months later in November 1995. As of that time, he had still done no testing on the miter gauge hold-down clamp, nor had he reviewed any such testing. He had still not seen the Sears' miter clamp accessory that he stated should be standard equipment. Tr. at 53–55. Backtracking from his first opinion, he stated that he did not endorse Sears' or any particular miter gauge clamp. *Id.* at 55. Rather he endorsed them "in general." *Id.* at 56. He could not describe how to attach the clamp and could not draw such a clamp. *Id.* at 57. He stated that he could not as of that time "come up with a design or a sketch for you that is going to encompass and consider all the things needed to be considered in the design." *Id.* at 58. He could not opine that he would consider Mr. Tassin's saw reasonably safe for the cut he was performing if it had been equipped with the miter gauge clamp. Rather he stated:

Question: If Mr. Tassin bought a table saw, this table saw, which had a miter gauge clamp, would you then consider the saw to be reasonably safe for the cut he was performing at the time of the accident?

Answer: Not necessarily. And the reason—let me qualify.

Question: Go ahead.

Answer: And the reason is because I've not looked specifically at all of the potential problems, if any—and I qualify it as if any—that the miter-type gauge that we address here may have caused or not caused, okay? Because I need to look at the piece that he was cutting and the particular gauge and clamp. If the gauge and clamp in combination for the workpiece that we're using did in fact clamp it and clamped it through the use of the piece, then, yes, I would go as this far as saying, yes, it would have been a reasonable alternative, if you will, for the saw. If it didn't—because, as I said, if it didn't take it through the full stroke or it creates

some other problems, then it may not. Until I look at them, I can't answer it.

And the reason I'm saying that is because if you run out and you take this piece and you lay this piece down and you say oh well, look, the miter clamp doesn't even come in the miter guide or miter gauge clamp doesn't even hold the piece; therefore, how can it do it, I'm not going to have that coming back at me. What I'm going to say is if, in fact, the clamp does hold the piece, as I have talked about; i.e., that that's what you've got to hold the piece, through the cut, yes, I believe that it would have either eliminated or prevented the accident.

*Id.* at 66–67. Mr. Killingsworth affirmed this testimony at the *Daubert* hearing.

At the *Daubert* hearing, Mr. Killingsworth still had not tested or reviewed any testing of the miter gauge hold-down clamp. Rather, he contented that he did not need to test the miter gauge hold-down clamp because his opinion was based on "standard engineering principles" and the "laws of physics." He stated that he based his opinion on a "vector analysis," which showed the directions of the forces generated on the equipment. He had never discussed this analysis in his three prior depositions or in his expert reports or affidavits. This vector analysis was based on a drawing of the miter gauge hold-down clamp in the Sear's manual. Mr. Killingsworth did not have dimensions or specifications on the clamp. *Daubert* hearing tr. at 54–55. He had still never examined the impact of the miter gauge clamp on the overall utility of the saw. *Id.* at 60. He did not do any engineering computations to verify his proposed alternative design. Despite the fact that he simply reviewed a drawing of the miter gauge hold-down clamp, he stated later in the *Daubert* hearing that an engineer could not determine from a photograph of a device whether it would prevent kickback. "The only way you are going to determine it is to see something live." Tr. at 130. He indicated that an engineer "couldn't conclude anything from a photograph because it is lacking in detail." *Id.*

■ Based on the foregoing testimony, the Court grants the defendants' motion to ex-

clude Mr. Killingsworth's opinion on the miter gauge hold-down clamp as an alternative design for the table saw. Mr. Killingsworth's methodology for determining that the miter gauge hold-down clamp is an alternative design is virtually nonexistent, which makes his opinion unreliable. He did not physically see the clamp, test the clamp, review the test of others, and the literature he relies on does not specifically endorse a miter gauge hold-down clamp as an alternative design. He formed his opinion based on a picture of a miter gauge clamp without knowing its dimensions or specifications and without performing any engineering calculations. He later stated that photographs are useless to determine whether a device can prevent kickback because they are insufficiently detailed. Furthermore, Mr. Killingsworth never considered the impact of the clamp on the utility of the saw and could not even opine that the use of the device could have prevented the accident. Rather, his testimony was to the effect that "I think it would have worked if it would have worked." *See* Nov. 1995 Tr. at 67. ("If, in fact, the clamp does hold the piece as I've talked about that's what you've got; i.e., that's what you've got to hold the piece, through the cut, yes, I believe that it would have either eliminated or prevented the accident.") For all of these reasons, his opinion on the miter gauge hold-down clamp is excluded.

b. *The Shophelper and the Integrated Shophelper*

■ Mr. Killingsworth also identified the Shophelper, a roller-type device, as an alternative design. He stated that he found the device in a catalog and obtained one from its manufacturer. Mr. Killingsworth did not know the extent of testing that the manufacturer of the Shophelper device had done on it. Nov. 1995 Tr. at 82. Nor did he inquire as to the rate of injury associated with the device. *Id.* at 82.

Although Mr. Killingsworth had not tested the device as of his November 1995 deposition, by his January 1996 deposition he had tested the Shophelper on a Sears' table saw, albeit not the saw in issue. He tested the device for alignment and reduction of kick-

back. His testing at that point consisted of a total of two and one-half hours of cutting and alignment tests. He took no photographs or notes to record his test results, but he did keep the pieces of wood that he cut. At that time, he had only tested the Shophelper on the dado-type cut that Mr. Tassin performed at the time of his accident. However, as of the *Daubert* hearing, Mr. Killingsworth had done additional testing on other types of cuts. He said that he repeated the tests done on the device by defendants' expert. He opined that the Shophelper could be used with the table saw to make dado and other types of cuts and that the use of the device prevented or reduced kickback. He took no photographs, nor did he record the results of his additional testing. He was not aware of any testing on the Shophelper device besides his own and that of the defendants' expert. He stated that the studies he relied on supported the notion of using rollers, of which the Shophelper was a specific example, to stabilize the workpiece. *Daubert* hearing tr. at 89–90.

Mr. Killingsworth also opined at his deposition that he would change the configuration of the Shophelper device before making it standard equipment on the table saw. He would integrate the device into the saw. January 1996 Tr. at 77. However, he said he was not asked to do this, but if he were, he would have to add other features, like pawls. *Id.* at 107. At the *Daubert* hearing, Mr. Killingsworth opined that both the Shophelper device and the "integrated Shophelper device" were alternative designs for the table saw in issue. He produced no drawing of an integrated Shophelper device, tested none, reviewed no test of others, and could not state precisely how he would integrate the device into the saw. He agreed that it would be beneficial to test a prototype to see if it were effective.

Defendants' motion to exclude Mr. Killingsworth's opinion that the Shophelper device was an alternative design for the table saw in issue is denied. It is undisputed that such a design existed when the product left the manufacturer's control. Mr. Killingsworth testified that the Shophelper is marketed separately as an accessory for

performing the type of cut Mr. Tassin performed. Further, Mr. Killingsworth tested the Shophelper on that type of cut, as well as on the other cuts that the saw is designed to perform. Defendants never seriously contested that Mr. Killingsworth's opinions about the nature and causes of kickback were supported by the studies upon which he relied. Further, he stated that these studies generally supported the idea that rollers serve as stabilizing devices, which can assist in preventing kickback. Defendants introduced no evidence of their own to undermine this testimony or the extent or nature of Mr. Killingsworth's tests. While Mr. Killingsworth clearly could have done more than he did, the Court concludes that the combination of the commercial availability of the device, Mr. Killingsworth's testing of it, and support for the stabilizing effect of rollers in the literature are sufficient to permit him to render his opinion. That Mr. Tassin could have done additional or more systematic testing or provided further corroboration for his views will go to the weight of his testimony.

 The "integrated Shophelper" is a different story. The Court grants defendants' motion to exclude Mr. Killingsworth's opinion as to the "integrated Shophelper." Mr. Killingsworth did not even produce a drawing of the integrated device. He did no testing and reviewed no testing of such a device. He performed no calculations to verify his views. He could point to no such integrated device that was commercially available. He could not even precisely state how the device would be integrated into the saw. His opinion on the integrated Shophelper device is excluded as speculative and unreliable.

c. *Pawls, Roller Clamps, Rollers, Clamps, Fingers.*

 In two affidavits filed in December 1995 and January 1996 in response to defendants' summary judgment motions, Mr. Killingsworth stated that "several feasible methods of preventing kickback" were available, including "pawls and roller clamps." He also stated that "pawls, clamps, rollers, and fingers" were all "guards" and that some such secondary guard should have

been provided with Mr. Tassin's saw. *See* Defendants' *Daubert* Motion at Ex. G. The affidavits provided no further identifying information as to the generic pawls, roller clamps, rollers, clamps, or fingers. Nor did Mr. Killingsworth state how he arrived at his conclusions. His depositions provided no further specifics to identify these proposed alternative designs.

Defendants' motion to exclude Mr. Killingsworth's opinion as to these unspecified pawls, clamps, rollers, roller clamps and fingers is granted. Mr. Killingsworth threw these items out for the first time at the end of 1995 in affidavits filed in response to defendants' summary judgment motions. Except for the Shophelper, which is a type of roller device, these items were never identified with any degree of specificity. They were never identified as alternative designs in response to an interrogatory requesting this information, nor were they mentioned in Mr. Killingsworth's two expert reports or his first two depositions. For these reasons alone, his opinions about them are excludable.

Mr. Killingsworth's opinion is essentially that anything that contributes to the stability of the workpiece could be an alternative design. This opinion is too general to be of any relevance to the issues before the jury, which are (1) whether a specific alternative design was available at the time the product left the manufacturer's control that could have prevented the accident and (2) whether the risk and severity of the accident outweighed the cost and diminished utility attendant upon including such an alternative design. Mr. Killingsworth does not even specify the dimensions of the generic pawls, clamps, fingers, or rollers that he mentions or state how they would be configured on the saw. He has provided no drawing of any of these items' placement on the saw. Except as to the Shophelper, he refers to no tests that he or anyone else has performed on a table saw of any specific pawl, clamp, roller, roller clamp or finger that would substantiate his opinion. Nor has he done any calculation, survey or analysis to reach a conclusion that any specific example of one of these generic items was an alternative design for this equipment. His opinion does not rest on a reliable foundation, and it is so general that it does not satisfy the basic test of relevance. For these reasons it is excluded.

### 3. The "Conspiracy" Opinion

■ In a supplemental report dated November 7, 1995, Mr. Killingsworth offered the opinion that based on records of the "Power Tool Institute," power tool manufacturers refused to incorporate safety devices in "fixed and hand-held tools" because of the "fear that incorporating these safety devices would open the manufacturers to lawsuits." *See* Defendants' *Daubert* Motion at Ex. E. He further opined that power tool manufacturers developed safety devices that were never incorporated into their products or were removed from the products for the same reasons. *Id.* Mr. Killingsworth proposed to deliver these opinions to the jury based on his review of some 5,000 pages of minutes, correspondence and memoranda of the Power Tool Institute. He did not personally attend the Power Tool Institute meetings and virtually none of the Power Tool Institute documents have been authenticated in this case. The documents contain multiple layers of hearsay; they involve manufacturers who are not parties to this case; and they deal with other types of equipment besides table saws. The extent to which the PTI documents even deal with table saws and these defendants have not been satisfactorily demonstrated to this Court. It is not disputed that none of the PTI documents directly reflects efforts by Sears or Emerson to prevent any alternative design at issue in this case from being included on a table saw.

The defendants challenge the admission of Mr. Killingsworth's "conspiracy" opinion on the basis of Rules 702, 703, and 403 of the Federal Rules of Evidence. As the Court ruled at the *Daubert* hearing, reviewing correspondence and minutes from meetings to reach conclusions is not a mechanical engineering issue. Documents of this type are not technical and do not require expert engineering testimony to make them comprehensible to a jury. For this reason, Mr. Killingsworth's testimony about these documents is not necessary to assist the trier of fact to

understand a fact in issue. Nor was it ever demonstrated that summaries of meetings and correspondence were the types of documents typically relied on by an engineer to determine the adequacy of a particular design of a particular product. For these reasons, Mr. Killingsworth may not testify about the conclusions he reached based on his review of these documents.

The Court further notes that the opinions stated in the supplemental expert report about unidentified power tool manufacturers of "fixed and hand-held tools" is irrelevant without a direct link to conduct by defendants regarding safety devices on table saws. Despite requests from the Court, it was never demonstrated that any of the PTI documents even supported the conclusions in the expert report, much less a conclusion implicating defendants in stonewalling safety devices on table saws. The Court instructed plaintiffs at the *Daubert* hearing that if they wished to establish that any of the Power Tools Institute documents were independently admissible as admissions or otherwise, they must specifically identify each such document, together with a statement as to the basis of its admissibility. To date, the Court has received no such statement.

#### 4. *Inadequate Warnings*

■ Mr. Killingsworth opined that the Sears' manual provided inadequate warnings because it did not properly describe the causes of kickback or warn that kickbacks could occur for *all* types of cuts, not simply rip cuts. In addition, he criticized defendants' warning because it failed to provide a description of a means to prevent kickback for other than rip cuts. Defendants' *Daubert* Motion at Ex. E, March 1994 Expert Report. Specifically, Mr. Killingsworth stated that the Sears manual was defective because it only addressed kickback for rip cuts and not other types of cuts like the dado cut that Mr. Tassin was performing at time of the accident. Defendants challenge Mr. Tassin's opinion because they claim that his testimony is not grounded in the scientific method and that he could not state that his proposed warning would have prevented Mr. Tassin's accident.

Unlike design defect cases, the Louisiana Products Liability Act does not specifically require the plaintiff to prove that a specific alternative warning existed that could have prevented the accident. Rather the claimant must show that, at the time the product left the manufacturer's control, it possessed a characteristic that could cause damage and that the manufacturer failed to use reasonable care to provide an adequate warning of the danger to users and handlers of the product. La.R.S. 9:2800.57(A). The LPLA defines an adequate warning as a warning or instruction that would lead an ordinary, reasonable user or handler of a product to contemplate the danger in using or handling the product and either to decline to use or handle the product or, if possible, to use or handle the product in such a manner as to avoid the damage for which the claim is made. *Id.* at 9:2800.53(9). Even if the plaintiff is not required to proffer full-blown warnings of his own, he must still demonstrate that the defendants' warning did not say something that it should have said to prove his case. In any event, Mr. Killingsworth provided warnings that he opined were missing from defendants' warnings. He further opined that had his warnings been included, they would have prevented the accident. *See* Defendants' *Daubert* Motion at Ex. G. Further, Mr. Killingsworth testified that he has experience in writing and in developing manuals and warnings for other types of products, such as medical equipment, robot manipulators, and personnel carriers.

■ The Court does not believe that a design engineer with experience in both product design and in preparing manuals and warnings must scientifically test an alternative warning before he can opine that a warning is defective. *See, e.g. Liriano v. Hobart Corp.,* 1996 WL 660904 (S.D.N.Y., November 1996). Here the asserted danger is kickback. Defendants have not refuted Mr. Killingsworth's opinions regarding the nature, causes and possible consequences of kickback or that kickback was involved in Mr. Tassin's accident. Further, Mr. Killingsworth's criticism of their warning is that defendants did not adequately warn the user of the dangers of kickback that were attendant upon all of

the procedures that the saw could perform. Thus, the warnings did not mention, for example, the risk of kickback with dado cuts, which Mr. Tassin was performing. Mr. Killingsworth also opined that the warnings did not adequately describe the conditions that could cause kickback to occur. Mr. Killingsworth's investigation into the causes of kickback, his review of defendants' manuals, his training and experience as a design engineer, particularly in the area of drafting warnings and manuals, together lead the Court to conclude that his opinion on inadequate warnings is sufficiently reliable to warrant admission in this case. Accordingly, defendants' motion to exclude Mr. Killingsworth's testimony as to defective warnings is denied. However, it is not clear from a review of Mr. Killingsworth's proposed warnings whether they incorporate a requirement that the saw be redesigned to include additional components. The warnings refer to "pawls" and a "hold-down clamp." The Court has already determined that Mr. Killingsworth may not testify that these items were alternative designs for the table saw. For the same reasons, he may not testify that the user must be warned to use such devices in order to use the saw safely.