Jeffrey Allen HANKS, by OLD NATIONAL TRUST COMPANY, Guardian of the Estate of Jeffrey Allen Hanks, a disabled person, Plaintiff,

v.

KOREA IRON & STEEL CO., LTD. and Ranco, Inc., also known as Gulf Coast Wire Rope Co., Defendants.

No. 95–CV–4152–JLF.

United States District Court,
S.D. Illinois.

Feb. 3, 1998.

Michael D. Freeborn, Freeborn & Waters, Chicago, IL, John E. Rhine, Rhine, Ernest, Mount Carmel, IL, for Plaintiff.

John P. McGahey, Wilson, Elser, Chicago, IL, for Defendants.

## MEMORANDUM AND ORDER

FOREMAN, District Judge.

Before the Court are various motions filed by both parties that are discussed below. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

### I. *Motion to Quash Depositions and for Protective Order.*

Defendant Kiswire, Ltd. (sued as Korea iron & Steel Works, Ltd.) has filed a Motion to Quash Depositions and For Protective Order (Doc. 100). Plaintiff has filed a Response (Doc. 108).

Defendant has moved to quash the depositions of Kiswire personnel, Mr. Sung Hum, Mr. Kit Hoon Kang, Mr. Soo Won Lee, and Mr. Jog Hak Lee. First, with regard to Mr. Sung Hum, Kiswire asserts that plaintiff has incorrectly identified him as "Mr. Sung Hum" instead of by his full name, "Mr. Sung Hum Baik." According to defendant. Mr. Baik's deposition has already been taken. Plaintiff has withdrawn the deposition notice for Mr. Sung Hum. Second, with regard to the remaining individuals. Kiswire asserts that the testimony of these individuals would be duplicative of testimony already obtained in previous depositions of Kiswire personnel. Contrary to plaintiff's objections, the Court finds that on the facts presented to the Court, the testimony that could be offered by these individuals would be duplicative and unhelpful to the issues before the Court. Accordingly, and for the reasons set forth in Kiswire's Memorandum (Doc. 101), Kiswire's Motion to Quash Depositions and For Protective Order (Doc. 100) is **GRANTED.**

### II. *Motion to Compel.*

Plaintiff has filed a Motion to Compel the depositions of Kiswire personnel Kil Hoon Kang. Soo Won Lee, and Jon Hak Lee (Doc. 104). For the reasons set forth in Section I, Plaintiff's Motion to Compel (Doc. 104) is **DENIED.**

### III. *Motion to Strike Testimony of Donald Pellow.*

Defendant has filed a Motion to Strike Testimony of Donald Pellow (Doc. 118). Plaintiff has filed a Motion for Leave to respond to this motion and has attached a proposed response (Doc. 128). Plaintiff's Motion for Leave (Doc. 128) is **GRANTED,** and the Court has considered plaintiff's proposed response in ruling on this issue.

#### A. *Background.*

Defendant has moved to strike the testimony of plaintiff's expert, Mr. Donald L. Pellow. An affidavit from Mr. Pellow is attached to plaintiff's opposition to defendant's summary judgment motion (Doc. 117, Exh. B). In this affidavit, Mr. Pellow has testified that it is "more probable than not" that the wire rope that failed was manufactured by Kiswire (Doc. 117, Exh. B, p. 2). He bases this opinion on his education, training, and experience, as well as his physical examination of, and a chemical analysis of the failed sample, and his comparison of it to a sample of known Kiswire rope.

Mr. Pellow is a Registered Professional Engineer with over 30 years of experience working in the wire rope industry (Doc. 117, Exh. B, p. 1). His expertise includes the design, testing, engineering, production, and field usage of wire rope (Doc. 117, Exh. B, p. 1).

Mr. Pellow's opinion is based, in part, on a physical analysis of the failed wire rope performed by comparing its physical characteristics to a piece of known Kiswire wire rope. Based upon his comparison of the physical characteristics, he concluded that the failed sample and the Kiswire wire rope were "very similar in construction." Specifically, he determined that the failed sample and the Kiswire wire rope were "similar in rope and core diameters, lay length of the ropes, strands and core; and the wire sizes" (Doc. 117, Exh. B, p. 1). He also concluded that both samples used the same type of lubricants (Doc. 117, Exh. B, p. 1).

Mr. Pellow's opinion is also based on a chemical analysis which was performed at a wire rope laboratory. Mr. Pellow asserts

that this laboratory is recognized and approved by the American Petroleum institute (API). Both the failed sample and Kiswire sample were subjected to processes called "electron spectroscopy" and "wet analysis" (Doc. 117, Exh. B, p. 1). Mr. Pellow states that these processes revealed that the failed sample and the Kiswire rope were "very similar in their chemical composition" (Doc. 117, Exh. B, p. 2). Mr. Pellow also asserts that the chemical analyses reveal that the steel used to make both wire rope samples were "most likely manufactured" using the "Basic Oxygen Furnace" rather than the "Electric Oxygen Furnace" method (Doc. 117, Exh. B, p. 2: Doc. 128, Exh. A, pp. 103, 108–09).[1]

### B. *Discussion.*

The admissibility of expert testimony is governed, in part, by Federal Rule of Evidence 702. Specifically, Rule 702 provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise. *Fed.R.Evid. 702.*

■ Guidance in interpreting Rule 702 was provided by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), where the Court determined the proper standard "for admitting expert scientific testimony in a federal trial." *Daubert,* 509 U.S. at 582. The Court rejected the *Frye* "general acceptance" test for the more liberal standard embodied in Federal Rule of Evidence 702. (*See Frye v. United States,* 293 F. 1013 (1923)); *see also General Elec. Co. v. Joiner,* —— U.S. ——, ——, 118 S.Ct. 512, 517, 139 L.Ed.2d 508

(1997) (noting that the *Daubert* standard will result in the admission of a somewhat broader range of testimony than *Frye*). Under this more liberal standard the expert need only testify to "(1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert,* 509 U.S. at 592.

Seventh Circuit cases interpreting *Daubert* have given district courts a two-step analysis to use in evaluating expert testimony under Rule 702. First, the district court must determine whether the expert's testimony is reliable, (i.e., is based on a reliable methodology). Second, *if* the testimony is reliable, the district court must then determine "whether the evidence or testimony will assist the trier of fact in understanding the evidence or determining a fact in issue." *Cummins v. Lyle Industries,* 93 F.3d 362, 368 (7th Cir.1996) (*quoting Porter v. Whitehall Labs.,* 9 F.3d 607, 616 (7th Cir.1993)).[2]

The Seventh Circuit has said that in the context of theoretical and applied science the reliability determination involves looking to whether the testimony in question pertains to scientific knowledge. *Cummins,* 93 F.3d at 368–69. In effect, the Seventh Circuit appears to have taken the position that testimony can pertain to scientific knowledge and can be fairly characterized as "scientific" *only* if it is based on a reliable methodology. Thus, the Seventh Circuit has collapsed the question of whether the testimony is reliable and whether it is scientific into a single inquiry.[3]

To assist the district courts in determining whether testimony qualifies as a scientific opinion, (i.e., a statement about scientific knowledge, which by virtue of that fact, is reliable and therefore eligible to be received into evidence under Rule 702), *Daubert* articulated four nonexclusive guidelines. These guidelines are: (1) whether the Proffered

---

1. Mr. Pellow's affidavit it sets forth his opinions, their bases, and incorporates information on his qualifications, training, and experience (Doc. 117, Exh. B. p. 1). Mr. Pellow's opinions are further explained by way of deposition testimony (Doc. 117, Exh. 13; Doc. 119, Exh. A). Given this information, the Court determines that no hearing is necessary to further explore the content, bases, or scope of his opinions.

2. In other words, there must be a "fit" between the testimony and the issue to which it is directed. *Daubert,* 509 U.S. at 591; *Cummins,* 93 F.3d at 370.

3. This approach is suggested by the statement in *Daubert* that in order to "qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method." *Daubert,* 509 U.S. at 590.

conclusion lends itself to verification by the scientific method through testing; (2) whether it has been subjected to peer review; (3) whether it has been evaluated in light of the potential rate of error of the scientific technique; and (4) whether it is consistent with the generally accepted method for gathering the relevant scientific evidence. *Daubert,* 509 U.S. at 593–94. The Seventh Circuit has said that the most important of these is "whether the proffered opinion has been subjected to the scientific method." *Cummins,* 93 F.3d at 368 (*citing Bradley v. Brown,* 42 F.3d 434, 438 (7th Cir.1994)).

The *Daubert* Court was careful to point out that its discussion did not reach "technical" or "specialized" knowledge under Rule 702. *See Daubert,* 509 U.S. at 590 n. 8. Chief Justice Rehnquist's partial dissent notes the problem:

> Does all of this *dicta* [regarding the several factors] apply to an expert seeking to testify on the basis of "technical or other specialized knowledge"—the other types of expert knowledge to which Rule 702 applies—or are the "general observations" limited only to "scientific knowledge"? What is the difference between scientific knowledge and technical knowledge; does Rule 702 actually contemplate that the phrase "scientific, technical, or other specialized knowledge" be broken down into numerous subspecies of expertise, or did its authors simply pick general descriptive language covering the sort of expert testimony which courts have customarily received?

*Daubert,* 509 U.S. at 600 (Rehnquist, C.J., concurring in part and dissenting in part).

In *Cummins v. Lyle Industries,* 93 F.3d 362, 367 n. 2 (7th Cir.1996), the plaintiff argued that the application of well-known instruments of the engineering profession to a particular and "not-out-of-the-ordinary" situation required substantial deviation from the paradigm announced by the Supreme Court in *Daubert.* The Seventh Circuit rejected that argument, stating:

> The Supreme Court did acknowledge in *Daubert* that, because the case presented a matter of scientific inquiry, its discussion was limited to the "scientific context." (citation omitted). The court also noted, just as pointedly, that its holding was not limit-

ed to cases involving "novel" scientific theories. *Daubert,* 509 U.S. at 592 n. 11. As the case law of this circuit amply demonstrates, we believe that this latter remark in *Daubert* counsels against a wholesale abandonment of the *Daubert* analysis simply because the issue before the court, although rooted in science, involves the application of science to a concrete and practical problem. *See, e.g., Buckner v. Sam's Club, Inc.,* 75 F.3d 290, 292–94 (7th Cir.1996) (safety management expert); *Deimer v. Cincinnati Sub–Zero Products, Inc.,* 58 F.3d 341 (7th Cir.1995) (testimony concerning cord wrap on hospital equipment).

*Cummins,* 93 F.3d at 367 n. 2.

The Seventh Circuit further noted that:

> It may be that, in some "as applied" situations, some of the non-exhaustive factors noted by the Supreme Court in *Daubert* are worthy of less emphasis than in situations involving more abstract or novel scientific theory. "The inquiry envisioned by Rule 702 is, we emphasize, a flexible one."

*Cummins,* 93 F.3d at 367 n. 2 (*quoting Daubert,* 509 U.S. at 594).

It is not always clear whether testimony, relates to "scientific knowledge," "technical knowledge," or "other specialized knowledge." indeed, "the drafters of Rule 702 seem to have acknowledged that the line between "scientific" and "technical" is not a bright one." *Cummins,* 93 F.3d at 367 n. 2 (*citing* Fed.R.Evid. 702 advisory committee note). However, which category Dr. Pellow's knowledge falls into is of little practical consequence. The bottom line is the same—that knowledge must be based on a reliable methodology.

As noted in *United States v. Hall,* 974 F.Supp. 1198 (C.D.Ill.1997):

> To sum up, the four factors laid out in Daubert must be applied when an expert bases his testimony on scientific hypotheses which are capable of being refuted by controlled experimentation. However, these factors may be applied in differing degrees when it comes to non-Newtonian science or "other specialized knowledge." Fed.R.Evid. 702. The only thing that re-

mains constant for all forms of expert testimony is that there must be some degree of reliability of the expert and the methods by which he has arrived at his conclusions. *Hall*, 974 F.Supp. 1198, 1202 (C.D.Ill.1997).

With this background, we turn to the facts of this case. The overall opinion proffered by Mr. Pellow, (i.e., that it is "more probable than not" that the failed wire rope was manufactured by Kiswire), consists of two components. First, he states that he examined a sample of the failed wire rope and a sample of known Kiswire wire rope and concluded that they were physically similar and used the same type of lubricants. Second, he reviewed the results of a chemical analysis and concluded that they were very, similar in their chemical compositions and were most likely both manufactured using the Basic Oxygen Furnace method.

Arguably, Mr. Pellow's testimony consists of a single overall opinion that has two bases. Or, it can be seen as two separate opinions, (i.e., that the failed sample and the Kiswire wire rope are: (1) physically similar: and (2) chemically similar). In the interests of clarity, the Court will approach Mr. Pellow's testimony as if it consists of two opinions.

### 1. *Physical Analysis.*

■ Turning to Mr. Pellow's first opinion that the wires are physically similar, it is debatable whether this opinion qualifies as testimony based on scientific, technical or specialized knowledge. On the one hand, his testimony appears to be based simply on his personal knowledge and observations. On the other hand, his opinion is bottomed on the knowledge that he possesses as a result of his thirty years in a scientific, technical or specialized field. In an abundance of caution, this Court will assume that the *Daubert* factors may be applied. Applying the first *Daubert* factor, the Court finds that Mr. Pellow's opinion that the wire ropes are physically similar would appear to lend itself to verification by the scientific method through testing. The Court also finds, however, that there is no indication of whether his methods have been subjected to peer review: whether they have been evaluated in light of the potential rate of error of his technique; or whether his methods are consistent with the generally accepted method

for gathering the relevant scientific evidence. *Daubert*, 509 U.S. at 593–94. Consequently, only one of the *Daubert* factors suggests that Mr. Pellow's physical analysis is reliable.

Even assuming that this first opinion was based on a reliable methodology, it would not survive the Court's second inquiry, which is to determine whether it "assists the trier of fact in understanding the evidence or in determining a fact in issue." *Cummins*, 93 F.3d at 368 (citations omitted). As aptly noted by defendant. Mr. Pellow compared the failed sample only to a known Kiswire sample. Mr. Pellow, did not compare the physical characteristics of either the failed sample or the Kiswire sample to any wire rope made by any other wire rope manufacturer.

Mr. Pellow's failure to compare the failed sample's physical characteristics to wire rope made by any other manufacturer renders his opinion meaningless to the Court and to a lay jury. Plaintiff argues that there are numerous cases allowing expert identification testimony even though the expert did not compare numerous samples. These cases involve voice identification, handwriting, bullets, footprints, shoes, and briefcases (Doc. 128, pp. 6–7). Wire rope, however, is quite different from these types of items. Most, if not all, members of a lay jury would know that the physical characteristics of voices, handwriting, bullets, footprints, shoes, and briefcases vary widely depending on their source. The Court has strong doubts that the average lay juror would know whether the physical characteristics of wire rope made by various manufacturers are by and large different or rare by and large the same. Because Mr. Pellow provides no context through references to, or comparisons with, other wire rope, his testimony is utterly unhelpful to the trier of fact.

If Mr. Pellow's physical comparison opinion is not reliable scientific knowledge, it might still be admissible. Many courts have recognized that testimony derived from experience or training although different from testimony derived from controlled experimentation, is nonetheless admissible under Rule 702 as specialized or technical knowledge. *See, e.g., United States v. Jones*, 107 F.3d 1147, 1157–58 (6th Cir.1997) (handwrit-

ing analysis is a field of expertise, and testimony relating thereto is admissible under Rule 702); *cf. United States v. Williams*, 81 F.3d 1434, 1441–42 (7th Cir.1996) (holding that witness with experience and training in the El Rukun gang code could testify to the code's meanings). Rule 702, however, requires that the testimony "assist the trier of fact to understand the evidence or to determine a fact in issue ..." *Fed.R.Evid. 702.* For the reasons set forth earlier. Mr. Pellow's physical comparison opinion lacks any kind of meaningful context and would therefore be unhelpful to a jury. Moreover, any minimal help it might provide would be substantially outweighed by its tendency to confuse or mislead the trier of fact.

If Mr. Pellow's physical comparison testimony is simply a statement of his personal opinion, based on his personal knowledge, it is inadmissible under Federal Rule of Evidence 701. Under Rule 701, a witness may testify from personal knowledge only if the testimony is: "(a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witnesses' testimony or the determination of a fact in issue." *Fed.R.Evid. 701.* Although Mr. Pellow's physical comparison testimony is rationally based on the perception of the witness, for the reasons set forth above it is not helpful. The same result obtains if Mr. Pellow's testimony is analyzed under Federal Rules of Evidence 401 and 403. Although his physical comparison is relevant under Rule 401, his conclusions regarding physical characteristics are given without any context. Thus, whatever probative value his testimony might have is substantially outweighed by its tendency to confuse and mislead the trier of fact; it should therefore be excluded under Rule 403.

Based on the foregoing, Mr. Pellow's physical comparison opinion is inadmissible. Consequently, defendant's motion to strike is granted as it relates to this portion of Mr. Pellow's testimony.

### 2. Chemical Analysis.

■ We now turn to Mr. Pellow's second opinion, i.e., his statement that based on a chemical analysis, the wire ropes are very, similar in chemical composition and were most likely both manufactured using the Basic Oxygen Furnace method. At first glance, this testimony appears to be a scientific opinion, (i.e., a statement based on scientific knowledge). In fact, however, it is not; it is simply speculation by a scientist. Looking to the *Daubert* factors, the first question is whether Mr. Pellow's second opinion lends itself to verification by the scientific method through testing. Unlike handwriting analysis, the methods used and the results obtained by a chemical analysis are amenable to controlled experimentation and are not derived simply from experience or training in the field. Mr. Pellow's testimony, however, provides no information about the nature of these tests, how they were performed, or whether or how their accuracy was verified. In addition, the Court finds that there is not a sufficient indication of whether the chemical analysis or the methods used to perform that analysis: (2) have been subjected to peer review, (3) have been evaluated in light of the potential rate of error of the scientific technique; or (4) are consistent with generally accepted methods for gathering the relevant scientific evidence. *Daubert*, 509 U.S. at 593–94. Consequently, the chemical analysis cannot be said to be based on a reliable methodology.[4]

If the chemical analysis on which Mr. Pellow bases his opinion were reliable, the second task would be to determine "whether [the] evidence or testimony assists the trier of fact in understanding the evidence or in determining a fact in issue." *Cummins*, 93 F.3d at 368 (citations omitted). As with his physical comparison opinion, however, the failed sample's chemical composition was not compared to that of wire rope made by any manufacturer other than Kiswire. Without such comparisons, the chemical analysis is essentially useless to a lay jury.

Mr. Pellow also states that the chemical analysis reveals that both the failed sample and the Kiswire sample were most likely manufactured using the "Basic Oxygen Fur-

---

4. The fact that the laboratory was recognized and approved by the API has some tendency to suggest consistency with generally accepted methods, but by itself this fact does not prove reliability.

nace" method (Doc. 117, Exh. B, p. 2). He does not state, however, how many other wire rope manufacturers have used the Basic Oxygen Furnace method. Without this context, as aptly noted by defendant, Mr. Pellow's chemical analysis reveals nothing more than that two wire ropes made from the same type of process will have similar characteristics. Mr. Pellow has testified that from 1980 to 1984 there were "very few [manufacturers] worldwide [and] none domestically that [he] know[s] of" who used the Basic Oxygen Furnace method (Doc. 119, Exh. A, pp. 103–04). Even assuming these statements to be correct, the Court finds that these assertions, without more, do not provide adequate support for Mr. Pellow's overall opinion that it is "more probable than not" that the wire rope that failed was manufactured by Kiswire. Finally, even if this second opinion were reliable, it would not assist the jury. Absent the context of other comparisons, this second opinion, like the first, is meaningless.

For the above reasons, the opinions contained in Mr. Pellow's affidavit are not reliable. Consequently, defendant's Motion to Strike Testimony of Donald Pellow (Doc. 118) is **GRANTED**.

### IV. *Motion to Strike Portions of Kiswire's Reply Support of Motion for Summary Judgment.*

Plaintiff has filed a Motion to Strike Portions of Kiswire's Reply in Support of Motion for Summary Judgment (Doc. 129). Defendant Kiswire has fled a Response (Doc. 132).

Plaintiff has moved to strike portions of Kiswire's Reply because it: 1) asserts for the first time that the wire rope was not defective; and 2) contains misstatements of evidence regarding the identification of the wire rope. As shown below, the Court has ruled on defendant's summary judgment motion on a basis that does not involve the portions that plaintiff moves to strike. Accordingly, plaintiff's Motion to Strike Portions of Kiswire's Reply (Doc. 129) is **MOOT**.

### V. *Motion for Summary Judgment.*

Also before the Court is Kiswire's Motion for Summary Judgment (Docs.109). Plaintiff has filed a Response (Doc. 117) and Kiswire has filed a Reply (Doc. 125). Plaintiff has filed a Supplemental Response (Doc. 126) to which Kiswire has objected (Doc. 127).

### A. *Background.*

On June 15, 1993, plaintiff was injured while working on a well service unit. At some point while he was on the unit, the scoping line cable broke, a pulley assembly fell onto his head, and plaintiff was injured. Plaintiff has brought this action alleging that the wire rope cable that broke was defective and was manufactured by defendant Kiswire.

A brief history of the oil well service unit is helpful to understanding this case. Plaintiff states that the oil rig involved in this case was originally built by John Hawkins in Graham, Texas. Ten years prior to plaintiff's accident, in late 1982, the rig was involved in another accident which resulted in damage to the telescoping poles. There was no damage to the scoping line so the scoping line was not replaced at this time. About a year later, in a separate incident, the scoping line broke; it was replaced some time in late 1983 or early 1984.

Plaintiff alleges that the scoping line that was put on the rig in late 1983 or early 1984 stayed on the rig until June 1993 when plaintiff was injured. Specifically, plaintiff states that sometime in 1984, the rig was repossessed by Graham National Bank The bank kept the rig in "Remington's yard, east of town," and later sold it to Coye Hamm who later sold it to the Nelsons. Thereafter, plaintiff was injured.

Plaintiff's evidence that Kiswire was the likely manufacturer of the failed rope is described as follows. As noted, plaintiff states that the oil well service unit was originally built by John Hawkins in Graham, Texas. Mr. Hawkins has testified that from 1982 to 1984 he bought all of his wire rope from two places: (1) Graham Wire Rope in Graham, Texas; or (2) Gulf Coast Wire Rope in Oklahoma City. Plaintiff further claims that other deposition testimony and record evidence establish that during the relevant time period, Graham Wire Rope did *not* sell any half-inch wire rope to Mr. Hawkins. Thus, reasons plaintiff, Mr. Hawkins must have purchased the failed wire rope from the Gulf Coast Wire Rope company. Plaintiff further

supports this conclusion by stating that "when Hawkins was first building the rig, he remembers driving to Oklahoma City and buying some line from Gulf Coast, perhaps in 1982." Other circumstances under which he could have purchased wire rope from Gulf Coast included "simply ordering it over the phone and having it shipped from Oklahoma City to Graham, Texas, where Hawkins would be billed for it." Finally, plaintiff asserts that Hawkins would have bought approximately only 70 feet of line and that it simply "could have been put in the trunk of a normal car." (Doc. 117, pp. 6–7).

Having concluded that Mr. Hawkins "must have purchased the failed wire rope from Gulf Coast Wire," plaintiff then asserts that Gulf Coast Wire purchased "a lot" of rope from Kiswire. According to plaintiff, "Kiswire was the 'dominant' manufacturer of wire rope sold by Gulf Coast" He supports this by stating that "When Gulf Coast went bankrupt, it owed Kiswire $320,872.89, and Kiswire was one of the company's biggest creditors" (Doc. 117, p. 7).

Plaintiff concedes that Gulf Coast had another big creditor named "Kulkoni." Plaintiff then asserts, however, that Gulf Coast did "quite a bit *more* business with Kiswire than with Kulkoni" and that "Gulf Coast *preferred* to do business with Kiswire rather than with Kulkoni." Finally, plaintiff asserts that Kulkoni has established that none of the half-inch wire rope it supplied to Gulf Coast in the relevant time period was used on the rig. Based on this reasoning, plaintiff concluded that "this leaves Kiswire alone as the most likely source" (Doc. 117, pp. 7–8).[5]

## B. *Discussion.*

Summary judgment is appropriate when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter law. *Fed.R.Civ.P. 56.* A defendant can obtain summary judgment by establishing that plaintiff cannot prove a necessary element of plaintiff's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–26, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Webber v. Armstrong World Industries, Inc.,* 235 Ill. App.3d 790, 175 Ill.Dec. 889, 601 N.E.2d 286,

290 (4 Dist.1992) (citations omitted); and *Zimmer v. Celotex Corp.,* 192 Ill.App.3d 1088, 140 Ill.Dec. 230, 549 N.E.2d 881, 884 (1 Dist. 1989). The parties agree that this diversity case is governed by Illinois law.

In a products liability action in Illinois, whether based on strict liability or negligence, plaintiff must identify the manufacturer of the product and must show a causal relationship between the injury and the product. *Zimmer v. Celotex,* 192 Ill.App.3d 1088, 140 Ill.Dec. 230, 549 N.E.2d 881, 883 (1 Dist. 1989) (*citing Schmidt v. Archer Iron Works, Inc.,* 44 Ill.2d 401, 256 N.E.2d 6, 8, *cert. denied* 398 U.S. 959, 90 S.Ct. 2173, 26 L.Ed.2d 544 (1970)); *see also Tragarz v. Keene Corp.,* 980 F.2d 411, 418 (7th Cir.1992). These elements may be proven either by direct or circumstantial evidence. *Zimmer,* 140 Ill.Dec. 230, 549 N.E.2d at 883.

In order to get to a jury, however, plaintiff must show more than a mere possibility that these elements exist. *Zimmer,* 140 Ill.Dec. 230, 549 N.E.2d at 883. Liability cannot be based on mere speculation, guess, or conjecture. *Id.* Where circumstantial evidence is relied upon, the circumstances must justify "an inference of probability as distinguished from mere possibility." *Zimmer,* 140 Ill.Dec. 230, 549 N.E.2d at 883 (*citing Naden v. Celotex Corp.,* 190 Ill.App.3d 410, 137 Ill.Dec. 821, 546 N.E.2d 766, 769 (1989); *Mateika v. LaSalle Thermogas Co.,* 94 Ill. App.3d 506, 49 Ill.Dec. 649, 418 N.E.2d 503, 505 (1981)). A fact is not established from circumstantial evidence unless the circumstances or events are "so related to each other as to make the conclusion the only probable, not possible, one that can be drawn from them." *York v. Lunkes,* 189 Ill.App.3d 689, 136 Ill.Dec. 954, 545 N.E.2d 478, 480 (1 Dist.1989) (*citing Mateika v. LaSalle Thermogas Co.,* 94 Ill.App.3d 506, 49 Ill.Dec. 649, 418 N.E.2d 503 (1981)).

Defendant has moved for summary judgment, in part, on the basis that plaintiff cannot establish that Kiswire was the manufacturer of the failed wire rope. Thus, says defendant, plaintiff cannot show an essential

---

5. As additional evidence that Kiswire was the manufacturer of the failed wire rope, plaintiff offers the testimony of his expert, Mr. Pellow.

As set forth in Section III, Mr. Pellow's testimony has been stricken and will not be considered further.

element of his case. Specifically, defendant claims that plaintiff has failed to come forth with any direct or circumstantial evidence that Kiswire manufactured the wire rope that failed.

Based upon a review of the record before the Court, plaintiff cannot produce any evidence (direct or circumstantial) of an essential element of his case, i.e., that Kiswire was the manufacturer of the wire rope that failed. Plaintiff first uses deductive reasoning that as between Graham Wire Rope (Graham, Texas) and Gulf Coast Wire (Oklahoma City), Mr. Hawkins must have bought the wire rope from Gulf Coast Wire. Plaintiff then reaches the conclusion that of all the suppliers to Gulf Coast Wire, Kiswire was the "most likely source." Plaintiff bases this latter conclusion on the facts that Gulf Coast Wire purchased "a lot" of rope from Kiswire, "Kiswire was the 'dominant' manufacturer of wire rope sold by Gulf Coast," and "When Gulf Coast went bankrupt, it owed Kiswire $320,872.89, and Kiswire was one of the company's biggest creditors." Although Gulf Coast Wire had another large creditor, Kulkoni, plaintiff says that Gulf Coast did "quite a bit *more* business with Kiswire than with Kulkoni," that "Gulf Coast *preferred* to do business with Kiswire rather than with Kulkoni," and that Kulkoni has established that none of the ½" wire rope it supplied to Gulf Coast Wire in the relevant time period was used on the rig.

Plaintiff's evidence against Kiswire is flawed in several respects. First, contrary to plaintiff's assertions, Kulkoni has *not* established that none of the half-inch wire rope it supplied to Gulf Coast Wire in the relevant time period was used on the rig. Plaintiff supports this proposition by citing pages 13 and 14 of the deposition of Mr. Becker. A review of these pages, however, does not lead the Court to the same conclusion.

Mr. Becker has been the President of Kulkoni since 1965 (Doc. 110, Exh.J. p. 7). From 1980 to 1984, Kulkoni did business with Gulf Coast Wire (Doc. 110, Exh. J, p. 8). When Gulf Coast Wire fled bankruptcy, Kulkoni filed a claim against Gulf Coast Wire in bankruptcy court for approximately $400,000 (Doc. 110, Exh.J. p. 9). In the early 1980s, two different manufacturers sold ½" wire rope to Kulkoni: 1) Boo–Koo Steel & Wire Company, (Busan, Korea), and 2) Nam Sun (Chang Won, Korea) (Doc. 110, Exh. J, pp. 13–14). Kulkoni sold one reel of ½" wire rope to Gulf Coast Wire on December 23, 1982 and another on January 4, 1983 (Doc. 110, Exh. J, pp. 18–19). One reel contains approximately 2,500 feet of wire rope (Doc. 110, Exh. J, pp. 15–16). There were also shipments of ½" wire rope on October 19, 1982, November 8, 1982, November 19, 1982, December 8, 1982, and January 13, 18, and 25, 1983 (Doc. 110, Exh. J, p. 31).

The record also shows that in addition to Kiswire and Kulkoni, Gulf Coast Wire bought wire rope from numerous other sources. Mr. Sullivan, the owner of Gulf Coast Wire, testified that he bought from about five or six foreign sources and half a dozen local sources (Doc. 110, Exh. K, p. 9). Mr. Sullivan testified that if someone was interested in buying 70 feet of wire rope, there would be a "jillion places" between Graham, Texas, and Oklahoma City which could have supplied this amount (Doc. 110.Exh. K, pp. 70–71).

Based on the above, plaintiff has not and cannot prove the essential element that Kiswire manufactured the wire rope in question. Although plaintiff offers circumstantial evidence that suggests this possibility, "a fact is not established from circumstantial evidence unless the circumstances or events are so related to each other as to make the conclusion the only probable, not possible, one that can be drawn from them." *York v. Lunkes,* 189 Ill.App.3d 689, 136 Ill.Dec. 954, 545 N.E.2d 478, 480 (1 Dist.1989) (*citing Mateika v. LaSalle Thermogas Co.,* 94 Ill. App.3d 506, 49 Ill.Dec. 649, 418 N.E.2d 503 (1981)). Here, plaintiff admits Gulf Coast's records prior to 1984 have been destroyed (Doc. 17, p. 8). Based on what has been presented to the Court, plaintiff can show, at best, only that Kiswire was a "possible" but not a "probable" manufacturer of the wire rope that failed.

Based on the foregoing, defendant has shown that plaintiff cannot prove the identity of the manufacturer which is a necessary element of his case. Consequently, defendant's motion for summary judgment is **GRANTED.**[6]

---

6. Defendant has also moved for summary judgment on the basis that Kiswire's rope always

## VI. *Summary.*

Defendant Kiswire's Motion to Quash Depositions and For Protective Order (Doc. 100) is **GRANTED.** Plaintiff's Motion to Compel (Doc. 104) is **DENIED.** Defendant Kiswire's Motion to Strike Testimony of Donald Pellow (Doc. 118) is **GRANTED.** Plaintiff's Motion for Leave to File Response to Kiswire's Motion to Strike Pellow Testimony (Doc. 128) is **GRANTED.** Plaintiff's Motion to Strike Portions of Kiswire's Reply in Support of Motion for Summary Judgment (Doc. 129) is **MOOT.** Defendant Kiswire's Motion for Summary Judgment (Doc. 109) is **GRANTED.** Plaintiff's claims against defendant Kiswire are **DISMISSED WITH PREJUDICE** and this action is **DISMISSED.** The Clerk of the Court is **DIRECTED** to enter Judgment accordingly.

**IT IS SO ORDERED.**

included yellow identifying tape that was woven into the wire rope itself and that the wire rope in question did not contain any such tape. Plaintiff attempts to create an issue of fact by offering evidence that from 1980–1984 not all half-inch Kiswire wire rope contained this identifying tape.

At this point, whether or not Kiswire wire rope always contained yellow identifying tape is irrelevant. A defendant can obtain summary judgment by establishing that plaintiff cannot prove a necessary element of plaintiff's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–26, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Webber,* 601 N.E.2d at 290; and *Zimmer,* 140 Ill.Dec. 230, 549 N.E.2d at 884. Defendant has established that plaintiff cannot prove a necessary element of his case and is entitled to summary judgment on that basis alone.